IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LAURA DELL BOOKER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| ERIC HOLDER, United States | § | CIVIL ACTION NO. H-07-2914 |
| Attorney General, and | § | |
| ROBERT S. MUELLER, III, | § | |
| Director of the Federal | § | |
| Bureau of Investigation, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Laura Dell Booker, an employee of the Federal Bureau of Investigation ("FBI"), brings this action against Eric Holder, the Attorney General of the United States, and Robert S. Mueller, III, the Director of the FBI (collectively, "the Defendants"), alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964 and discrimination on the basis of a perceived disability in violation of the Rehabilitation Act of 1973 and retaliation in violation of both status. Pending before the court is the Federal Defendants' Motion to Dismiss Unexhausted Claims & Motion for Summary Judgment as to All Remaining Claims (Docket Entry No. 22). In response, Booker has filed Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss Unexhausted Claims and Motion for Summary Judgment as to All

Remaining Claims (Docket Entry No. 26).  The Defendants have also filed a Reply in Support of Their Motion to Dismiss Unexhausted Claims & Motion for Summary Judgment as to All Remaining Claims (Docket Entry No. 27).  For the reasons explained below, Federal Defendants' Motion to Dismiss Unexhausted Claims & Motion for Summary Judgment as to All Remaining Claims will be granted, and this action will be dismissed.

## I.   <u>Undisputed Facts</u>

Booker, an African-American female,[1] began her employment with the FBI on April 27, 1997.[2]  She was initially hired as a typist.[3]  In April of 1999 Booker was promoted to the position of Support Services Technician ("SST"), the position she held in 2005 when the allegedly discriminatory and/or retaliatory actions that form the basis for this action occurred.[4]  When she was hired by the FBI Booker had already been diagnosed with hypertension, or high blood pressure.[5]  At some point before 2005 Booker's supervisors at the

---

[1]Plaintiff's Original Complaint, Docket Entry No. 1, ¶ 13.

[2]Oral Deposition of Laura Booker, at 6 (included in Federal Defendants' Motion to Dismiss Unexhausted Claims & Motion for Summary Judgment as to All Remaining Claims ("Defendants' Motion"), Docket Entry No. 22, at Exhibit 1).

[3]<u>Id.</u>

[4]<u>See id.</u> at 6, 13; Performance Appraisal Report, at 3 (July 28, 2005) (included in Defendants' Motion, Docket Entry No. 22, at Exhibit 3).

[5]Oral Deposition of Laura Booker, at 11 (included in Defendants' Motion, Docket Entry No. 22, at Exhibit 1).

FBI became aware that she had been diagnosed with hypertension.[6] Booker's hypertension did not impact her job performance.[7]

In her annual performance reviews from 2000-2004 Booker received a summary rating of at least "meets expectations."[8]   In July of 2004 Booker received a "Quality Step Increase" ("QSI") based on good job performance upon the recommendation of her supervisors, Office Service Supervisor ("OSS") Rosalie McAdams, a white female, and Supervisory Special Agent ("SSA") Kenneth Ivy, an African-American male.[9]

Booker alleges that in early 2005 she began to have conflicts with SSA Ivy, who supervised Squad C4-E.[10]   Booker alleges that in early 2005, she was repeatedly harassed, falsely accused of failing

_____

[6]Id.

[7]Id.

[8]See Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss Unexhausted Claims and Motion for Summary Judgment as to All Remaining Claims ("Plaintiff's Response"), Docket Entry No. 26, at Exhibits 6-10.

[9]Oral Deposition of Laura Booker, at 17-19 (included in Defendants' Motion, Docket Entry No. 22, at Exhibit 1); Sworn Statement of Rosalie McAdams, at BookerFBI-000569 (included in Plaintiff's Response, Docket Entry No. 26, at Exhibit 3).

[10]See Performance Appraisal Report, at BookerFBI-000621 (included in Defendants' Motion, Docket Entry No. 22, at Exhibit 3) (describing a conversation on January 10, 2005, in which "Ms. Booker expressed to SSA Ivy her dislike of him reminding her to do things that she planned to take care of when she had time. . . .   When the handling of the mail was discussed, she stated that if SSA Ivy was unhappy with the way she did the mail, that he could do it himself.").

to perform work assignments, and accused of being prejudiced against white women by Special Agent ("SA") Vanessa Walther, a white female.[11]  Booker contends that Walther repeatedly asked her to "back-date" certain documents to make it look as though Walther had timely delivered documents to Booker when she had not done so.[12] Booker asserts that she refused to do this for Walther.[13]  Booker contends that she notified SSA Ivy about Walther's behavior, but that Ivy did nothing.[14]

In early 2005 Booker began missing work for medical reasons.[15] Booker told OSS McAdams that she was experiencing medical problems and requested an alternative work schedule so that she could be out of the office during normal business hours.[16]  On March 2, 2005, OSS McAdams approved Booker's request for an alternative work schedule so that she could schedule medical appointments without using leave.[17]

---

[11]Declaration of Laura Booker, ¶¶ 4-6 (included in Plaintiff's Response, Docket Entry No. 26, at Exhibit 2).

[12]Id.

[13]Id.

[14]Id.

[15]See Sworn Statement of Rosalie McAdams, at BookerFBI-000567 (included in Plaintiff's Response, Docket Entry No. 26, at Exhibit 3).

[16]Plaintiff's Original Complaint, Docket Entry No. 1, ¶ 21.

[17]Id.  See also Memorandum from Rosalie F. McAdams to Laura D. Booker (included in Defendants' Motion, Docket Entry No. 22, at Exhibit 5).

In March of 2005 Booker applied for a promotion to the position of OSS.[18]  Booker was one of three applicants selected to interview for the position with Administrative Officer ("AO") Rodney Mattix and Supervisory Administrative Specialist ("SAS") Ernye Zawitkowski.[19]  The other two candidates were Karla Proctor and Graciela Medina.[20]  Mattix's secretary scheduled an appointment for the interview with Booker on March 16, 2005, but did not notify Booker that the meeting would be an interview for the OSS position.[21]  On March 16, 2005, when Booker met with Mattix and Zawitkowski, Booker learned that the meeting would be an interview for the OSS position, and she asked to reschedule the interview, but Mattix and Zawitkowski proceeded with the interview.[22]  On March 21, 2005, Booker received notice that Karla Proctor, an African-American woman, had been selected for the OSS position.[23]

---

[18]Oral Deposition of Laura Booker, at 19 (included in Defendants' Motion, Docket Entry No. 22, at Exhibit 1).

[19]Sworn Statement of Rodney Mattix, at BookerFBI-000555 (included in Defendants' Motion, Docket Entry No. 22, Exhibit 2).

[20]Id.

[21]Declaration of Laura Booker, ¶ 7 (included in Plaintiff's Response, Docket Entry No. 26, at Exhibit 2).

[22]Sworn Statement of Rodney Mattix, at BookerFBI-000556 (included in Defendants' Motion, Docket Entry No. 22, Exhibit 2).

[23]Oral Deposition of Laura Booker, at 34-35 (included in Defendants' Motion, Docket Entry No. 22, at Exhibit 1).  See also E-mail from Lashunda Y. Neal to HO ALL EMPLOYEES (March 21, 2005, 9:54 A.M.) (announcing that Karla Proctor had been selected for the OSS position) (included in Defendants' Motion, Docket Entry No. 22, at Exhibit 9).

In April of 2005 Booker again discussed her high blood
pressure and frequent absence from work with OSS McAdams.[24]  Booker
asked McAdams about her options for taking medical leave, should it
become necessary.[25]   McAdams drafted a memorandum to Booker
recommending that she seek assistance through the Employee
Assistance Program ("EAP").[26]   Booker contends that the original
draft of the memorandum included language suggesting that her
hypertension had negatively impacted her job performance, that she
asked OSS McAdams to remove that language, and that on April 25,
2005, after the objectionable language had been removed from the
memorandum, Booker accepted and signed the memorandum.[27]

On May 17, 2005, OSS McAdams and SSA Ivy informed Booker that
she would be transferred away from squad C4-E.  Booker contends
that Ivy told her she would be transferred to a less stressful

---

[24]Declaration of Laura Booker, ¶ 12 (included in Plaintiff's
Response, Docket Entry No. 26, at Exhibit 2); Sworn Statement of
Rosalie McAdams, at BookerFBI-000567 (included in Plaintiff's
Response, Docket Entry No. 26, at Exhibit 3).

[25]Declaration of Laura Booker, ¶ 12 (included in Plaintiff's
Response, Docket Entry No. 26, at Exhibit 2).

[26]Id. ¶ 12; Sworn Statement of Rosalie McAdams, at
BookerFBI-000567 (included in Plaintiff's Response, Docket Entry
No. 26, at Exhibit 3).

[27]Declaration of Laura Booker, ¶¶ 13-14 (included in
Plaintiff's Response, Docket Entry No. 26, at Exhibit 2); Sworn
Statement of Rosalie McAdams, at BookerFBI-000567 (included in
Plaintiff's Response, Docket Entry No. 26, at Exhibit 3).   See
also Memorandum from Rosalie F. McAdams to Laura D. Booker
(included in Defendants' Motion, Docket Entry No. 22, at Exhibit
5).

position in stationary surveillance under Ray Washington because of her health.[28]

On May 20, 2005, Booker initiated contact with an EEO [Equal Employment Opportunity] counselor.[29]  Booker alleges that after she sought EEO counseling she was informed by AO Mattix and SAS Zawitkowski that she would not be transferred to the position in stationary surveillance under Ray Washington but, instead, to squad CI-1 where she would work a desk that she characterizes as a "punish desk" because it is "located in the middle of the hallway, in a high-traffic walkway, next to the office copy machine . . . where [she had] . . . very little, if any, interaction with agents."[30]

Booker contends that her transfer to squad CI-1 and assignment to the "punish desk," where she worked for about one year, were punitive and that while there her work responsibilities were reduced.[31]  Booker explains

> [w]hile working as an SST with the C4-E squad, my duties included inputting bank robbery statistical data into the BRSA system; ensuring newly assigned task force members were in compliance with security protocol by coordinating

---

[28]Oral Deposition of Laura Booker, at 22-23 (included in Defendants' Motion, Docket Entry No. 22, at Exhibit 1); Declaration of Laura Booker, ¶ 15 (included in Plaintiff's Response, Docket Entry No. 26, at Exhibit 2).

[29]Declaration of Laura Booker, ¶ 16 (included in Plaintiff's Response, Docket Entry No. 26, at Exhibit 2).

[30]Id. at ¶ 17.

[31]Oral Deposition of Laura Booker, at 75 (included in Defendants' Motion, Docket Entry No. 22, at Exhibit 1).

security escorts for their time spent at the facility; creating task force schedules; coordinating the 90-day training schedule for new agents assigned to the C4-E squad; answering the phone daily, daily filing, serializing files, uploading files/documents, time and attendance; and victim witness reports.[32]

Booker contends that upon transfer her duties "were reduced to filing once per week, time and attendance and answering the phone on average of three (3) times per week . . . and upload[ing] a document every once in a while."[33]  However, Booker admits that her job title, pay grade, salary, and hours did not change.[34]

On June 17, 2005, Booker received notification of her right to file a formal discrimination complaint, and on July 27, 2005, Booker filed a formal complaint of disability discrimination with the Department of Justice's Office of Equal Employment Opportunity Affairs ("OEEOA").[35]

On July 28, 2005, OSS McAdams informed Booker that she had received a summary rating of "does not meet expectations" for two out of seven "critical elements" on her annual Performance

---

[32]Declaration of Laura Booker, ¶ 30 (included in Plaintiff's Response, Docket Entry No. 26, at Exhibit 2).

[33]Id.

[34]Oral Deposition of Laura Booker, at 80-81 (included in Defendants' Motion, Docket Entry No. 22, at Exhibit 1).

[35]Id. at 23; Declaration of Laura Booker, ¶ 18 (included in Plaintiff's Response, Docket Entry No. 26, at Exhibit 2).  See also Defendants' Motion, Docket Entry No. 22, at Exhibit 15, at BookerFBI-000024 (Notice of Right to File a Discrimination Complaint), and BookerFBI-000029 (Complaint of Discrimination).

Appraisal Report ("PAR") for the year ending June 20, 2005.[36]  The report provided narrative explanations for the "does not meet expectations" ratings given for the two critical elements of "[r]elating with [o]thers and [p]roviding [p]rofessional [s]ervice" and '[p]erforming [a]dministrative [a]ctivities."[37]  Booker refused to sign the report, appealed the "does not meet expectations" ratings, and on August 25, 2005, Booker received notice that her summary rating had been changed to "meets expectations."[38]

On October 3, 2005, Booker amended her formal complaint of discrimination to include a claim for hostile work environment.[39] After conducting an investigation, the OEEOA issued a final order regarding Booker's complaint on June 4, 2007.[40]  The final order concluded that "the record does not support complainant's claim

_____

[36]Oral Deposition of Laura Booker, at 24, 63-65 (included in Defendants' Motion, Docket Entry No. 22, at Exhibit 1); Declaration of Laura Booker, ¶ 19 (included in Plaintiff's Response, Docket Entry No. 26, at Exhibit 2).

[37]Performance Appraisal Report at 2 (included in Plaintiff's Response, Docket Entry No. 26, at Exhibit 4).

[38]Id.; Declaration of Laura Booker, ¶¶ 19 and 28 (included in Plaintiff's Response, Docket Entry No. 26, at Exhibit 2); and Oral Deposition of Laura Booker, at 24, 63-65 (included in Defendants' Motion, Docket Entry No. 22, at Exhibit 1).

[39]Plaintiff's Original Complaint, Docket Entry No. 1, at ¶ 9 and Exhibit 2 (Addendum to Complaint of Discrimination); Oral Deposition of Laura Booker, at 24 (included in Defendants' Motion, Docket Entry No. 22, at Exhibit 1).

[40]Department of Justice Final Order, at 1, Laura D. Booker v. FBI, Complaint No. F-05-6047 (included in Plaintiff's Original Complaint, Docket Entry No. 1, at Exhibit 3).

that she was discriminated against due to her race, sex, or a disability, or retaliated against for prior EEO activity, in any of the instances identified in her complaint."[41]

In June of 2007 Booker was transferred out of her position in squad CI-1 to squad SO-4/5, and has since been promoted to a "GS-8," the highest grade level an SST can hold.[42]

## II.  **Procedural Background**

Booker filed this action on September 10, 2007.[43]  Booker asserts three claims for relief:  (1) that she was unlawfully discriminated against on the basis of her race or color by being subjected to a hostile work environment by non-black employees;[44] (2) that she was unlawfully discriminated against on the basis of a perceived disability by being denied a promotion to the OSS position and assigned to a "punish desk" located in the middle of a hallway;[45] and (3) that she was unlawfully retaliated against because she sought EEO counseling and filed a formal EEO complaint

---

[41]Id. at 19.

[42]Declaration of Rodney Mattix, ¶ 7 (included in Federal Defendants' Reply in Support of Their Motion to Dismiss Unexhausted Claims & Motion for Summary Judgment as to All Remaining Claims ("Defendants' Reply"), Docket Entry No. 27, at Exhibit 1).

[43]See Plaintiff's Original Complaint, Docket Entry No. 1.

[44]Id. ¶¶ 38-39.

[45]Id. ¶¶ 40-41.

by being assigned to a "punish desk" and denied a promotion to the OSS position.[46]  Booker seeks declaratory judgment, various forms of damages, as well as costs and attorney's fees.[47]  The Defendants seek dismissal of unexhausted claims arising from Booker's failed application for promotion to the OSS position in March of 2005, and summary judgment on all other claims.

### III.  <u>Defendants' Motion to Dismiss Unexhausted Claims</u>

The Defendants contend that any claim Booker is asserting or attempting to assert for the failure to notify her that the meeting with AO Mattix on March 16, 2005, was an interview for the OSS position, or for the failure to promote her to the OSS position are time barred because Booker failed to timely exhaust her administrative remedies by filing an administrative complaint within 45 days after the underlying events occurred.  Booker does not dispute that she failed to file an administrative complaint within 45 days after she was interviewed for or notified that she had not been selected for promotion to the OSS position in March of 2005.  Without disputing that any claims she has asserted or attempted to assert based on the Defendants' failure to promote her to the OSS position in March of 2005 are time barred due to her failure to exhaust administrative remedies, Booker argues that her

---

[46]<u>Id.</u> ¶¶ 42-43.

[47]<u>Id.</u> at 11.

allegations regarding the March 16, 2005, interview for the OSS position are properly before the court because those allegations concern one of a series of related acts that, together, created the hostile work environment of which she complains.[48]  Asserting that because she filed her administrative complaint within 45 days of receiving notice that she would be transferred, and that her transfer to squad CI-1 is one of the series of related acts that created the hostile work environment of which she complains, Booker argues that her allegations about the March 16, 2005, interview are timely because her claim for a hostile work environment is subject to the continuing violation theory.[49]

## A.   Standard of Review

Defendants argue that their motion to dismiss claims that they contend are time barred due to Booker's failure to exhaust administrative remedies should be considered under Federal Rule of Civil Procedure 12(b)(1), which allows dismissal for failure to establish subject matter jurisdiction.  Acknowledging the existence of a split in Fifth Circuit authority over whether the exhaustion requirement implicates the court's subject matter jurisdiction or whether the exhaustion requirement is merely a prerequisite to

---

[48]Plaintiff's Response, Docket Entry No. 26, at 7 ("Plaintiff alleges race discrimination creating a hostile work environment in violation of Title VII. . . Plaintiff does not make a separate claim for failure to promote . . . ") and 9.

[49]<u>Id.</u> at 9.

filing suit that is subject to waiver and estoppel, defendants argue that Rule 12(b)(1) provides the proper standard of review in this case because Booker does not contend that her claims are subject to waiver or estoppel.[50]  For the reasons explained below, the court will consider defendants' motion to dismiss under the standard provided by Federal Rule of Civil Procedure 12(b)(6).

The Fifth Circuit has recognized a split in authority in the federal sector context over "whether a Title-VII prerequisite, such as exhaustion, is merely a prerequisite to suit, and thus subject to waiver and estoppel, or whether it is a requirement that implicates subject matter jurisdiction." Pacheco v. Mineta, 448 F.3d 783, 788 n.7 (5th Cir.), cert. denied, 127 S.Ct. 299 (2006). The Supreme Court has held that in the private sector context Title VII's charge filing requirements are not jurisdictional prerequisites to suit in federal court but are, instead, requirements that, like a statute of limitations, are subject to waiver, estoppel, and equitable tolling, Zipes v. Trans World Airlines, Inc., 102 S. Ct. 1127, 1132 (1982).  Motions to dismiss based on limitations are generally reviewed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for which relief may be granted, and the standard of review for a motion to dismiss under Rule 12(b)(6) is generally more favorable to non-movants than the standard of review for a motion to dismiss

---

[50]Defendants' Motion, Docket Entry No. 22, pp. 13-14 & n.80.

under Rule 12(b)(1) for lack of subject matter jurisdiction.  The
court will therefore analyze the Defendants' motion to dismiss
under Rule 12(b)(6) instead of Rule 12(b)(1).

A Rule 12(b)(6) motion to dismiss for failure to state a claim
for which relief may be granted tests the formal sufficiency of the
pleadings and is "appropriate when a defendant attacks the
complaint because it fails to state a legally cognizable claim."
Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001), cert.
denied sub nom Cloud v. United States, 122 S.Ct. 2665 (2002).  The
court must accept the factual allegations of the complaint as true,
view them in a light most favorable to the plaintiff, and draw all
reasonable inferences in the plaintiff's favor.   Id.

> When a federal court reviews the sufficiency of a
> complaint, before the reception of any evidence either by
> affidavit or admissions, its task is necessarily a
> limited one.  The issue is not whether a plaintiff will
> ultimately prevail but whether the claimant is entitled
> to offer evidence to support the claims.

Swierkiewicz v. Sorema N.A., 122 S.Ct. 992, 997 (2002) (quoting
Scheuer v. Rhodes, 94 S.Ct. 1683, 1686 (1974)).  To avoid dismissal
a plaintiff must allege "enough facts to state a claim to relief
that is plausible on its face." Bell Atlantic Corp. v. Twombly,
127 S.Ct. 1955, 1974 (2007).  A statute of limitations defense may
be asserted by a Rule 12(b)(6) motion when that defense appears on
the face of the complaint.  See Songbyrd, Inc. v. Bearsville
Records, Inc., 104 F.3d 773, 776 n.3 (5th Cir. 1997) (citing Kansa
Reinsurance Co. Ltd. v. Congressional Mortgage Corp. of Texas, 20

-14-

F.3d 1362, 1366 (5th Cir. 1994)).

In considering a Rule 12(b)(6) motion to dismiss a court must limit itself to the contents of the pleadings.   In <u>Collins v. Morgan Stanley Dean Witter</u>, 224 F.3d 496, 498-99 (5th Cir. 2000), however, the Fifth Circuit approved the district court's consideration of certain documents the defendant attached to a motion to dismiss, and to which the plaintiff did not object.   The Fifth Circuit has since explained that a district court's consideration of documents attached to a motion to dismiss is "restricted . . . to documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." <u>Scanlan v. Tex. A & M University</u>, 343 F.3d 533, 536 (5th Cir. 2003) (citing <u>Collins</u>, 224 F.3d at 498-99).

**B.   Exhaustion Requirements and Administrative Filing Deadlines**

As a precondition to filing a suit under Title VII, the "complaining employee[] must exhaust [her] administrative remedies by filing a charge of discrimination with the [Equal Opportunity Office] of [her] agency." <u>Pacheco</u>, 448 F.3d at 788 (citing <u>Brown v. General Services Administration</u>, 96 S. Ct. 1961, 1967-68 (1976); <u>Martinez v. Department of the United States Army</u>, 317 F.3d 511 (5th Cir. 2003); and 29 C.F.R. § 1614.105-107).   Suits brought under § 501 of the Rehabilitation Act, 29 U.S.C. § 791, are also "subject to the same procedural constraints (administrative exhaustion, etc.) set forth in Title VII of the Civil Rights Act . . . ."

-15-

<u>Prewitt v. United States Postal Service</u>, 662 F.2d 292, 304 (5th Cir. 1981).   <u>See</u> 29 U.S.C. § 794a(a)(1).   <u>See also</u> <u>Bowers v. Nicholson</u>, 271 Fed. Appx. 446, 449 n.8 (5th Cir. 2008) (citing <u>Rivera v. Heyman</u>, 157 F.3d 101, 104 (2d Cir. 1998), for its holding that Rehabilitation Act plaintiffs must exhaust Title VII remedies).

The proper procedures for federal employees to exhaust their administrative remedies are promulgated at 29 C.F.R. § 1614.105. <u>See</u> <u>Ramsey v. Henderson</u>, 286 F.3d 264, 269 & n.5 (5th Cir. 2002). Under 29 C.F.R. § 1614.105(a) "[a]ggrieved persons who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age or handicap must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter."  The aggrieved employee "must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."[51]   29 C.F.R. § 1614.105(a)(1).   Discrimination claims alleging conduct that

---

[51]The 45-day time limit can be extended in certain situations including, <u>inter alia</u>, if the plaintiff can show that she "was not notified of the time limits and was not otherwise aware of them, that . . . she did not know and reasonably should not have known that the discriminatory matter or personnel action occurred, [or] that despite due diligence . . . she was prevented by circumstances beyond . . . her control from contacting the counselor within the time limits . . . ."  29 C.F.R. § 1614.105(a)(2).  Booker does not assert that the deadline should have been extended under 29 C.F.R. § 1614.105(a)(2) or that equitable doctrines apply.

occurred more than 45 days before the employee contacts the EEO counselor are considered time barred absent a defense of waiver, estoppel, or equitable tolling.  See National R.R. Passenger Corp. v. Morgan, 122 S. Ct. 2061, 2071 (2002) (explaining that if a plaintiff does not file an administrative charge within the required period of time after a discrete discriminatory act occurs, she "lose[s] the ability to recover for it"); Pacheco v. Rice, 966 F.2d 904, 905 (5th Cir. 1992) ("Failure to notify the EEO counselor in a timely fashion may bar a claim, absent a defense of waiver, estoppel, or equitable tolling."); Henderson v. United States Verterans Administration, 790 F.2d 436, 440-41 (5th Cir. 1986) ("The timely notification to the appropriate administrative authority of a complaint of discrimination is a precondition to suit and may bar the claim.").

A hostile work environment that violates Title VII exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Morgan, 122 S. Ct. at 2074 (quoting Harris v. Forklift Systems, Inc., 114 S.Ct. 367, 370 (1993)).  Unlike a plaintiff asserting claims based on allegations of discrete acts, a plaintiff asserting a hostile work environment claim is not limited to filing suit on events that fall within the requisite time period because such claims are "composed of a series of separate acts that collectively constitute one 'unlawful

-17-

employment practice.'" Id. (quoting 42 U.S.C. § 2000e-5(e)(1)).
Under the continuing violation theory courts may consider "the
entire scope of the hostile work environment claim," including
conduct alleged to have occurred outside the 45-day window,
provided that "an act contributing to that hostile environment
takes place within the . . . time period." Id. at 2068.  The
continuing violation doctrine is designed to "accommodate
plaintiffs who can show that there has been a pattern or policy of
discrimination continuing from outside the limitations period into
the . . . limitations period, so that all discriminatory acts
committed as part of this pattern or policy can be considered
timely." Celestine v. Petroleos de Venezuela SA, 266 F.3d 343,
351 (5th Cir. 2001).

> [A] plaintiff seeking to invoke this doctrine must
> demonstrate more than a series of discrete discriminatory
> acts:  "[She] must show an organized scheme leading to
> and including a present violation, such that it is the
> cumulative effect of the discriminatory practice, rather
> than any discrete occurrence, that gives rise to the
> cause of action."

Id. at 352 (quoting Huckabay v. Moore, 142 F.3d 233, 239 (5th Cir.
1998)).  The Fifth Circuit has identified three factors that may be
considered in determining the existence of continuing violation:
(1) whether the alleged acts evidence the same type of
discrimination; (2) whether the alleged acts are recurring or are
more in the nature of isolated work assignments or incidents; and
(3) whether the alleged acts have the degree of permanence that
should trigger an employee's awareness of and duty to assert his or

-18-

her rights.  Id.  "'In addition, the continuing violation theory requires the same type of discriminatory acts to occur both inside and outside the limitations period,' such that a valid connection exists between them."  Id.  (quoting Estate of Martineau v. ARCO Chemical Co., 203 F.3d 904, 913 (5th Cir. 2000)).   The Fifth Circuit has cautioned courts to apply the "theory of continuing violation . . . guardedly . . . because within it are the seeds of the destruction of statutes of limitation in Title VII cases." Abrams v. Baylor College of Medicine, 805 F.2d 528, 533 (5th Cir. 1986).

## C.  Analysis

Booker does not dispute that her interview for the OSS position occurred on March 16, 2005, that she was notified that she had not received the OSS position on March 21, 2005, and that she did not contact an EEO counselor until May 20, 2005, 60 days after she learned that she had not been promoted.  Unless the allegedly discriminatory acts associated with Booker's interview for the OSS position belong to a series of related acts that constitute a continuing violation, any claims based on those acts are barred by Booker's failure to timely initiate the administrative process.

Booker argues that her allegations regarding the events surrounding her interview for the OSS position are properly before the court because they belong to a series of related acts that

should all be considered timely because her transfer to squad CI-1 occurred within the applicable "limitation period and is part of [the] series of related acts."[52]  The allegedly discriminatory acts that Booker argues constitute the series of related acts that created the hostile work environment of which she complains are: (1) that in March of 2005 she was invited to a meeting with AO Mattix but was not notified that the meeting would be an interview for the OSS position, and that when she learned the true nature of the meeting and asked to reschedule the interview, AO Mattix and SAS Zawitkowski refused to reschedule the interview; (2) that in April of 2005 SSA Ivy took no corrective action when Booker reported to him that SA Walther had falsely accused Booker of not liking her because she is white, (3) that in April of 2005 OSS McAdams took no corrective action when Booker complained to her about her work environment and how she was being treated; and (4) that only on May 17, 2005, when she learned that she was being transferred involuntarily to another squad, did Booker realize that these actions constituted a pattern of discriminatory conduct.[53]

The failure of AO Mattix's secretary to notify Booker that the meeting scheduled for March 16, 2005, was actually an interview for the OSS position, and the refusal of AO Mattix and SAS Zawitkowski to reschedule that meeting at Booker's request are not recurring

---

[52]Plaintiff's Response, Docket Entry No. 26, at 9.

[53]<u>Id.</u> at 5-8.

acts but, instead, isolated incidents that occurred only once, and
that exhibited a degree of permanence.  Although alone these acts
might not have triggered Booker's awareness of and duty to assert
her rights, that duty was triggered on March 21, 2005, when Booker
received notice that she had not been selected for promotion to the
OSS position for which she interviewed.

Booker's allegations that Mattix's secretary failed to notify
her about the nature of the March 16, 2005, meeting, and that AO
Mattix and SAS Zawitkowski refused to grant her request to
reschedule that interview concern acts that are related to her
undisputedly time-barred claim for failure to promote and are not
related to the only other act that undisputedly occurred within 45
days of the day she initiated contact with an EEO counselor, i.e.,
the notice of transfer that defendants gave her on May 17, 2005.
The Supreme Court has consistently held that the failure to promote
and/or decisions regarding transfers are discrete acts that give
rise to independently actionable claims.  See Morgan, 122 S.Ct. at
2073.  "'Discrete adverse actions . . . cannot be lumped together
with the day-to-day pattern of racial harassment' and therefore, if
otherwise untimely, cannot be saved by the continuing violation
doctrine."  Celestine, 266 F.3d at 352 (quoting Huckabay, 142 F.3d
at 240).  "An employee who claims to be the victim of a racially
motivated failure to promote . . . is put on notice that [her]
rights have been violated at the time the adverse employment

decision occurs." <u>Id.</u>  <u>See also</u> <u>Pegram v. Honeywell, Inc.</u>, 361 F.3d 272, 279 (5th Cir. 2004) (in <u>Morgan</u> the Supreme Court "held that discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges").

Defendants' motion to dismiss any claims that Booker is asserting based on allegations regarding the March 16, 2005, interview for the OSS position will be granted because those actions are related to the failure to promote claim for which Booker undisputedly failed to timely exhaust her administrative remedies and are not related to claims arising from the other acts that Booker alleges created a hostile work environment. <u>See</u> <u>Eberle v. Gonzales</u>, 240 Fed. Appx. 622, 627-28 (5th Cir. 2007) (dismissing failure to promote claim for plaintiff's failure to comply with the 45-day notification requirement).

## IV.  **Defendants' Motion for Summary Judgment**

Booker asserts claims for race and disability discrimination and for retaliation under Title VII and the Rehabilitation Act. Defendants argue that they are entitled to summary judgment on each of these claims because Booker is unable to establish a <u>prima facie</u> case for any of them.

### A.  **Standard of Review**

Summary judgment is authorized if the movant establishes that

there is no genuine dispute about any material fact and the law entitles it to judgment.  Fed. R. Civ. P. 56(c).  Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2511 (1986).  The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986).  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting Celotex, 106 S.Ct. at 2553-2554).  If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. Id. (citing Celotex, 106 S.Ct. at 2553-2554).  In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson

Plumbing Products Inc., 120 S.Ct. 2097, 2110 (2000).  Factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts."  Little, 37 F.3d at 1075.

## B.   Applicable Law

Plaintiffs in employment discrimination cases may present their cases by either direct or circumstantial evidence, or both.  See Machinchick v. PB Power, Inc., 398 F.3d 345, 350 (5th Cir. 2005).  Direct evidence is "evidence which, if believed, proves the fact [in question] without inference or presumption."  Fabela v. Socorro Independent School District, 329 F.3d 409, 415 (5th Cir. 2003).  "In a Title VII context, direct evidence includes any statement or document which shows on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action."  Id.  Booker's claims are not based on direct but on circumstantial evidence.  Circumstantial evidence is assembled using the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 93 S.Ct. 1817 (1973), and clarified by the Supreme Court in Reeves v. Sanderson Plumbing, Inc., 120 S.Ct. 2097 (2000).  Under the McDonnell Douglas burden-shifting analysis the plaintiff must present evidence establishing the existence of a prima facie case.  McDonnell Douglas, 93 S.Ct. at 1824.  Once the plaintiff establishes a prima facie case, a presumption of discrimination arises and the burden of production

shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the employment action at issue.  Id.  If the defendant meets this burden of production, the presumption of discrimination created by the plaintiff's prima facie case disappears, and the plaintiff must meet its ultimate burden of persuasion on the issue of intentional discrimination.  A plaintiff may meet this burden by producing evidence tending to show that the reason offered by the defendant is a pretext for discrimination. Id. at 1825.

**C.    Analysis**

　　1.   Race Discrimination

Booker alleges that she was "subjected to hostile treatment by non-black employees and subjected to different rules based upon her race and/or color"[54] and that such treatment "had the effect of unreasonably interfering with Plaintiff's work performance and/or created an intimidating, hostile or offensive work environment."[55] Booker alleges that she was harassed an the basis of her race by being subjected "to excessively critical performance review while other non-black employees were not being treated in the same or similar manner" and "to adverse employment conditions because of her race . . . [when she] was reassigned to a 'punish desk' work station located in the middle of the hallway, in a high-traffic

---

[54]Plaintiff's Original Complaint, Docket Entry No. 1, ¶ 38.

[55]Id. ¶ 39.

walkway, next to the office copier."[56]

(a)  Applicable Law for Hostile Work Environment Claims

Title VII makes it "an unlawful employment practice for an employer to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's . . . race . . ." 42 U.S.C. § 2000e-2(a)(1).  To establish a prima facie case of race-based hostile work environment Booker must establish that: (1) she belonged to a protected class; (2) she was subject to unwelcome harassment; (3) the harassment was based on her race; (4) the harassment affected a term, condition, or privilege of employment.  Ramsey, 286 F.3d at 268.  For harassment effected by a co-worker, Booker must also show that her employer knew of or should have known of the harassment but failed to take prompt remedial action.  Id.

(b)  Application of Law to the Facts

Defendants argue that they are entitled to summary judgment on Booker's race-based hostile work environment claim because Booker cannot show that the harassment of which she complains was motivated by racial animus, or that any harassment she experienced affected a term, condition, or privilege of her employment.

**(1)  No Evidence of Racial Animus**

As evidence that the harassment of which she complains was

---

[56]Id. at 38.

motivated by racial animus, Booker argues that SA Walther, a white woman, criticized Booker's job performance and accused Booker of not liking her because she is white, that her supervisors were aware of the racial nature of the harassment she experienced from SA Walther but failed to take remedial action and, instead, reacted negatively by transferring her to another squad and giving her a poor annual performance review.[57]

### (i)  Walther's Harassment

Booker describes the harassment she experienced from SA Walther as follows:

> 4.   In early 2005 I reported to SSA Ivy that I believed I was being targeted and discriminated against by

---

[57]Plaintiff's Response, Docket Entry No. 26, at 11. Although Booker also argues that the events surrounding her interview for the OSS position on March 16, 2005, constitute evidence of racial animus, for the reasons stated in § III, above, the court has already concluded that any claims that Booker has asserted or may be attempting to assert based on these events are time barred for failure to exhaust administrative remedies.  Alternatively, the court concludes that the events surrounding Booker's March 16, 2005, interview for the OSS position do not constitute evidence capable of raising a genuine issue of material fact for trial on her claim for race-based hostile work environment.  Booker asserts that she was not informed that the meeting with AO Mattix on March 16, 2005, would be an interview for the OSS position, and asserts that the other interviewees were told.  However, Booker admits that she did not know how many other candidates had applied for the OSS position, and fails to explain how she knew or why she should have known that the other interviewees were told in advance that the meetings scheduled with AO Mattix would be interviews for the OSS position.  Moreover, Booker fails to make any showing that the other interviewees did not belong to her protected class, and acknowledges that Karla Proctor, the interviewee chosen to fill the OSS position is, like Booker, an African-American woman and, therefore, a member of Booker's protected class.  See Oral Deposition of Laura Booker, at 19 and 34-35 (included in Defendants' Motion, Docket Entry No. 22, at Exhibit 1).

Special Agent Vanessa Walther (Walther) because of my race — black.  I told Ivy that Walther was creating an environment of racial hostility by falsely accusing me of being prejudice against white women, openly displaying disgust with me personally and professionally, and verbally attacking me at work in front of the squad. Walther repeatedly made false accusations to SSA Ivy about me including saying that I failed to perform requested tasks when in fact Walther had not asked me to do anything.

5. At the time, one of my job duties was to make copies for the agents in squad C4-E, including Walther.  Another was to maintain the agents' files by filing the documents delivered to me by the agents.  To request copies, the agents would place sticky notes on the documents telling me when and how many copies were needed.  Walther rarely, if ever, did this. Because Walther failed to do this, I did not make copies for her and she began accusing me of not wanting to make copies for her after being asked to do so.  However, she had not asked me to make any copies.  Also, to properly maintain the files, it was important for the agents to timely deliver documents to plaintiff.  Walther routinely held documents longer than acceptable and often asked me to "back-date" the documents to appear as though Walther delivered them to plaintiff on time or at least earlier than the date she in fact delivered them to her.  "Back-dating" documents is against FBI policy and I refused to do it.

6. When I refused to back date the documents, Walther's attitude toward me got even more intense. After that time, everything I did Walther met with confrontation.  In fact, I discovered that Walther, on more than one occasion, went back into the files to place sticky notes on pages, where those notes were not previously attached, to make it appear as though I deliberately ignored those notes.  I reported this behavior to SSA Ivy.  Specifically I reported that Walther was going back into files and adding sticky notes to make it appear as though I was deliberately ignoring Walther's requests. Because of this interaction with SA Walther, SSA Ivy was independently aware of Walther's actions

-28-

toward me and still did nothing.[58]

These excerpts from Booker's declaration are the only evidence before the court of Walther's alleged harassment.[59] Although Booker asserts that she "believed" she was being "targeted and discriminated against by . . . Walther because of [her] race—black,"[60] Booker fails to describe even a single instance in which Walther made any race-based comments or took any action from which a rational juror could infer that the reasons for which Walther openly criticized Booker were based on racial animosity and not on disagreements over the manner in which Booker performed tasks such as copying documents and accepting back-dated documents for filing. Nor has Booker presented any evidence showing that Walther treated other similarly situated employees who were not members of Booker's

---

[58]Declaration of Laura Booker, ¶¶ 4-6 (included in Plaintiff's Response, Docket Entry No. 26, at Exhibit 2).

[59]Although Booker cites to excerpts from her deposition that she claims show her to have testified that Walther, on more than one occasion, stated to her, "you don't like me 'cause I'm white," the cited excerpts are not attached to Booker's response in opposition to defendants' motion for summary judgment. See Plaintiff's Response, Docket Entry No. 26, at 11. Moreover, even if these cited excerpts from Booker's deposition were attached to Booker's response in opposition to the Defendants' motion, they would not, alone, be sufficient to raise a genuine issue of material fact for trial regarding racial animus because Booker fails to present any evidence of when or how frequently Walther made these remarks, and "mere utterance of an . . . epithet which engenders offensive feelings in an employee" does not sufficiently affect the conditions of employment to implicate Title VII. Harris v. Forklift Systems, Inc., 114 S.Ct. 367, 370 (1993).

[60]Declaration of Laura Booker, ¶ 4 (included in Plaintiff's Response, Docket Entry No. 26, at Exhibit 2).

protected class any differently than she treated Booker.  On the
contrary, Booker has submitted a sworn statement from Sandra Garcia
Knox, a Hispanic woman who like Booker held that position of SST,
showing that Walther did not treat Booker any differently than she
treated other similarly situated employees who were not members of
Booker's protected class.

Knox describes the harassment that she experienced from
Walther as follows:

> While employed at the Federal Bureau of Investigation
> (FBI), I observed Vanessa Walther's treatment of myself
> and others in an unprofessional and disrespectful manner.
> On many occasions SA Walther would submit documents that
> were backdated which would cause problems with file
> audits.[61]

Knox's sworn statement shows that, like Booker, Knox experienced
problems with Walther that stemmed from Walther's practice of back-
dating documents that Knox was responsible for filing.  Knox's
sworn statement showing that Walther treated Knox, a person who did
not belong to Booker's protected class, the same as she treated
Booker, does not support Booker's contention that Walther's harass-
ment of her was motivated by animosity for Booker's race — black.

(ii)  Supervisors' Awareness and Response

Booker's contentions that she complained about Walther's race-
based harassment to her supervisors, but that they took no remedial
action and, instead, reacted negatively by transferring her to

---

[61]Sworn Statement of Sandra Garcia Knox (attached to
Plaintiff's Response, Docket Entry No. 26, at Exhibit 3).

another squad and giving her a poor annual performance review are not supported by the evidence.[62]

Although Booker complained about Walther to SSA Ivy "in early 2005,"[63] and to OSS McAdams "[i]n early April of 2005,"[64] those complaints were based solely on Walther's failure to place sticky notes on the documents that she wanted Booker to copy, and on Walther's practice of back-dating documents that she gave Booker to file. Booker cites to excerpts from her deposition that she claims show Walther, on more than one occasion, stated to her, "you don't like me 'cause I'm white,"[65] but the cited excerpts are not attached to Booker's response in opposition to the Defendants' motion for summary judgment. Moreover, even if these cited excerpts from Booker's deposition were attached to Booker's response in opposition to the Defendants' motion, they would not be sufficient to raise a genuine issue of material fact for trial because Booker fails to present any evidence showing that she ever reported these remarks to her supervisors. See Harris, 114 S.Ct. at 370 ("mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII").

_____

[62]Plaintiff's Response, Docket Entry No. 26, at 11.

[63]Declaration of Laura Booker, ¶ 4 (included in Plaintiff's Response, Docket Entry No. 26, at Exhibit 2).

[64]Id. at ¶ 10.

[65]Plaintiff's Response, Docket Entry No. 26, at 11.

Booker's contention that the two "does not meet expectations" ratings that she received on her 2005 PAR resulted from race-based animus is belied by Booker's admissions that she engaged in conduct that justified the ratings, _i.e._, Booker admits that she told OSS McAdams that she would not file back-dated documents that she received from Walther unless she was allowed to indicate the actual date on which she received the documents,[66] she refused to follow OSS McAdams' directive to contact each of the agents in her squad daily to remind them to fill out their time and attendance forms,[67] and she failed to follow SSA Ivy's instruction to remind him of an important meeting.[68]   Moreover, Booker has failed to submit any evidence showing that employees who similarly refused to follow instructions did not receive similar ratings on their annual PARs, and Booker testified that she did not know of any other employee who had been treated differently under the same or similar circumstances.[69]

(iii)  Conclusions as to Racial Animus

For the reasons explained above, the court concludes that Booker has failed to submit any evidence from which a rational

---

[66]Declaration of Laura Booker, ¶ 10 (included in Plaintiff's Response, Docket Entry No. 26, at Exhibit 2).

[67]Id. ¶ 11.

[68]Id. ¶ 27.

[69]Oral Deposition of Laura Booker, at 65 (included in Defendants' Motion, Docket Entry No. 22, at Exhibit 1).

juror could conclude that the harassment she allegedly experienced from Walther was caused by racial animus, that she gave her supervisors any reason to believe that her problems with Walther were based on race, or that Walther and/or Booker's supervisors treated Booker any differently than they treated other similarly situated employees who were not members of Booker's protected class under the same or similar circumstances.

### (2)   No Evidence that Harassment Affected a Term, Condition, or Privilege of Booker's Employment

Defendants argue that Booker has failed to establish that the harassment she allegedly suffered affected a term, condition, or privilege of her employment.  To satisfy this element Booker must show that she experienced harassment that was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Ramsey, 286 F.3d at 269 (quoting Meritor Savings Bank, FSB v. Vinson, 106 S.Ct. 2399, 2405 (1986)). To be actionable the harassment at issue must have created an environment that was both subjectively and objectively offensive. Septimus v. University of Houston, 399 F.3d 601, 611 (5th Cir. 2005).  Courts look to the totality of the circumstances to determine whether the objective element is satisfied, considering factors such as the frequency of the conduct, its severity, the degree to which it is physically threatening or humiliating as opposed to being a mere offensive utterance, and the degree to which it unreasonably interferes with an employee's work

-33-

performance.  Id.  See also Turner v. Baylor Richardson Medical
Center, 476 F.3d 337, 347-48 (5th Cir. 2007).  The Supreme Court
has cautioned lower courts considering claims of discrimination
based on a hostile work environment not to view the record in
piecemeal fashion, Washington v. Davis, 96 S.Ct. 2040, 2049 (1976),
but to look at "all the circumstances" when determining "whether an
environment is 'hostile' or 'abusive.'" Harris, 114 S.Ct. at 371.

As evidence that the harassment of which she complains
affected a term, condition, or privilege of her employment, Booker
argues

1.  That re-assign[ment] to the "punish desk" was
    punitive, embarrassing and humiliating in that
    Plaintiff was stripped of her job duties. . . By
    assigning Plaintiff to the "punish desk" Plaintiff
    was labeled a problem employee affecting her
    chances for career advancement.  In September 2005
    Plaintiff applied for another promotion to OSS. . .
    Booker scored high enough to be granted an
    interview but again was not selected for the job.

2.  Plaintiff was given an unwarranted "does not meet
    expectation" rating on her annual PAR in July
    2005.[70]

Booker's contention that the two "does not meet expectations"
ratings that she received on the PAR dated July 27, 2005, affected
a term, condition, or privilege of her employment is belied by her
admissions that less than a month later on August 24, 2005, these

---

[70]Plaintiff's Response, Docket Entry No. 26, at 12.

two ratings were amended to "meets expectations,"[71] and that the amendments eliminated any negative impact the original ratings could potentially have had on her future prospects for promotion or other favorable employment actions.[72]  Booker's contention that her transfer to another squad and assignment to a "punishment desk" affected a term, condition, or privilege of her employment is similarly belied by her admission that following her transfer and assignment to the "punish desk," her job title, salary, and hours of work did not change.[73]  Nevertheless, Booker contends that her duties were reduced following her assignment to the "punish desk." Booker's own description of the duties she performed both before and after her transfer show only that she no longer performed one job duty, i.e., the duty of serializing documents, and that the frequency with which she performed some other duties such as filing and answering phones was reduced.[74]  Booker fails to present any evidence that the conduct she experienced was physically threatening or sufficiently humiliating that it unreasonably interfered with her work performance.  Viewing the evidence in the light most favorable to Booker, the court concludes that it is

---

[71]Oral Deposition of Laura Booker, at 63-65 (included in Defendants' Motion, Docket Entry No. 22, at Exhibit 1).

[72]Id. at 81.

[73]Id. at 80-81.

[74]Declaration of Laura Booker, ¶ 30 (included in Plaintiff's Response, Docket Entry No. 26, at Exhibit 2).

insufficient to raise a genuine issue of material fact for trial because a rational juror could not conclude or even infer from Booker's evidence that the conduct she argues created a hostile work environment was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Ramsey, 286 F.3d at 269.

(c)   Conclusions on Race Discrimination Claim

A plaintiff raises a genuine issue of material fact for trial on a claim of hostile work environment only when a rational juror could view all of the allegedly harassing conduct as the product of racial hostility.   Booker has failed to present any evidence of derogatory treatment that was specifically directed at her because of her race.   Booker's evidence of harassment amounts to no more than a series of discrete acts arising from workplace disputes that cannot support a hostile work environment claim.   Defendants' motion for summary judgment on Booker's claim that she was subjected to a racially hostile work environment claim will be granted because viewing the evidence submitted in a light most favorable to Booker, the court concludes that it is not sufficient for a rational juror to conclude that the harassment Booker alleges she experienced was either motivated by racial animus or sufficiently severe or pervasive to create a racially abusive environment.

2.   Disability Discrimination

Booker alleges that she

> was denied a position as on Office Support Supervisor due
> to her employer's perception of a disability—that
> plaintiff's medical condition would prevent Plaintiff
> from performing the functions of an OSS.  In addition,
> Plaintiff was made to report to a punish desk located in
> the middle of the hallway, in a high-traffic walkway,
> next to the office copier, separated only by a four foot
> partition.  Plaintiff was subject to disparate treatment
> on the basis of a perceived disability.[75]

Defendants argue that they are entitled to summary judgment on Booker's disability discrimination claim because she cannot establish that they perceived her to be disabled.[76]

(a)  Disability Discrimination

Under the Rehabilitation Act an individual claiming discrimination must show that she:  (1) is an "individual with a disability;" (2) who is "otherwise qualified" for the job in question; (3) who worked for a "program or activity receiving Federal financial assistance;" and (4) was discriminated against "solely by reason of her or his disability."  Hileman v. City of Dallas, Texas, 115 F.3d 352, 353 (5th Cir. 1997) (quoting 29 U.S.C. § 794(a).  The standards used for determining whether the Rehabilitation Act has been violated in an employment discrimination suit are the same as the standards for determining if the Americans with Disabilities Act ("ADA") has been violated in an employment discrimination suit.  29 U.S.C. § 791(g) (2000).

---

[75]Plaintiff's Original Complaint, Docket Entry No. 1, ¶ 40.

[76]Defendants' Motion, Docket Entry No. 22, at 22-24.

Pinkerton v. Spellings, 529 F.3d 513, 517 (5th Cir. 2008).  Under
the ADA an individual has a "disability" if he:  (A) has a physical
or mental impairment that substantially limits one or more of his
major life activities; (B) has a record of such an impairment; or
(C) has been regarded as having such an impairment.   42 U.S.C.
§ 12102(2).  See E.E.O.C. v. Chevron Phillips Chemical Co., LP, 570
F.3d 606, 614 (5th Cir. 2009).

     Since Booker does not assert that she was disabled or had a
record of a disability but merely claims that the Defendants
perceived her as such, the court need only consider whether the FBI
regarded her as having an impairment that substantially limited in
the performance of one or more major life activities.   The ADA's
implementing regulations provide a non-exhaustive list of major
life activities, including "caring for oneself, performing manual
tasks, walking, seeing, hearing, speaking, breathing, learning, and
working."   Id. (quoting 29 C.F.R. § 1630.2(I)).   A person is
regarded as being significantly restricted in a major life activity
when she (1) has an impairment that is not substantially limiting
but which her employer considers to be substantially limiting;
(2) has an impairment which is substantially limiting only because
of others' attitudes; or (3) has no impairment but is perceived by
her employer as having a substantially limiting impairment.
Bridges v. City of Bossier, 92 F.3d 329, 332 (5th Cir. 1996), cert.
denied, 117 S.Ct. 770 (1997) (citing Dutcher v. Ingalls
Shipbuilding, 53 F.3d 723, 727-28 n.19 (5th Cir. 1995) (quoting 29
C.F.R. § 1630.2(I)(1)).   See also E.E.O.C. v. E.I. Du Pont de

Nemours & Co., 480 F.3d 724, 729 (5th Cir. 2007).

      (b)  Application of the Law to the Facts

     Booker's disability discrimination claim fails because she has neither argued nor presented any evidence from which a rational juror could conclude that the FBI regarded her as having an impairment that prevented her from performing any major life activity.   Booker merely asserts that "SAS Zawitkowski and AO Mattix regarded [her] hypertension as a condition that would prevent her from performing the duties of an OSS,"[77] that OSS McAdams referred her to the Employment Assistance Program, and that she was punitively "reassigned to a post with substantially limited job duties."[78]  Assuming without deciding that these assertions as true, they are insufficient to raise a genuine issue of material fact for trial on Booker's claim of disability discrimination because an employer may regard an employee as impaired or restricted from one position or a narrow range of jobs without regarding her as "disabled."  See E.I. Du Pont de Nemours, 480 F.3d at 729 (citing Pryor v. Trane Co., 138 F.3d 1024 (5th Cir. 1998)). In Pryor the Fifth Circuit held that the employee could not be regarded as disabled because her work restrictions limited her only from performing a particular job and not to an entire class of jobs.   138 F.3d at 1028.   It is undisputed that Booker never stopped working as an SST for the FBI, and that on two different

---

[77]Plaintiff's Response, Docket Entry No. 26, at 19.

[78]Id.

occasions in 2005 she was among the finalists interviewed for a promotion to the position of OSS.  The FBI's continued employment of Booker and repeated consideration of her for promotion to the position of OSS belies her contention that the FBI regarded her as disabled.

(c)  Conclusions on Disability Discrimination Claim

Defendants' motion for summary judgment on Booker's disability discrimination claim will be granted because viewing the evidence submitted in a light most favorable to Booker, the court concludes that the evidence is not sufficient for a rational juror to conclude that the Defendants regarded her as disabled.

3.  <u>Retaliation</u>

Booker alleges that she was subjected to retaliation in violation of Title VII and the Rehabilitation Act because she "1) sought EEO counseling for discriminatory treatment, and 2) filed a formal EEO complaint alleging racially discriminatory treatment, made complaints regarding a hostile work environment and harassment against her, and filed a charge of discrimination with the D[epartment] O[f] J[ustice]."[79]  Booker alleges that her "formal EEO complaint regarding racial and physical disability discrimination was a proximate cause of defendant's retaliatory conduct including the failure to promote Plaintiff into an OSS

_____

[79]Plaintiff's Original Complaint, Docket Entry No. 1, ¶ 42.

position."[80]  Booker also alleges that she was "re-reassigned to a 'punish desk' located in the middle of the hallway, in a high-traffic walkway, next to the office copier . . . for making complaints of discrimination and hostile work environment."[81] Defendants argue that they are entitled to summary judgment of Booker's retaliation claims because she cannot establish a <u>prima facie</u> case.

> (a)  Applicable Law for Retaliation Claims

The Fifth Circuit applies the same standard for analyzing retaliation claims brought under Title VII and the Rehabilitation Act.  <u>See</u> <u>Calderon v. Potter</u>, 113 Fed. Appx. 586, 592 & n.1 (5th Cir. 2004).  To establish a <u>prima facie</u> case of retaliation Booker must show that (1) she participated in an activity protected by Title VII and/or the Rehabilitation Act; (2) her employer took a materially adverse employment action against her; and (3) a causal connection exists between the protected activity and the materially adverse action.  <u>Aryain v. Wal-Mart Stores, Texas LP</u>, 534 F.3d 473, 484 (5th Cir. 2008).  To constitute prohibited retaliation an employment action must be one that a "reasonable employee would have found . . . [to be] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  <u>Id.</u> (quoting <u>Burlington</u>

---

[80] <u>Id.</u>

[81] <u>Id.</u> ¶ 43.

Northern & Santa Fe Ry. Co. v. White, 126 S.Ct. 2405, 2415 (2006)).
The purpose of this objective standard is to separate "significant
from trivial harms" and "filter out complaints attacking the
ordinary tribulations of the workplace, such as the sporadic use of
abusive language, gender-related jokes, and occasional teasing."
White, 126 S.Ct. at 2415.  Even when an adverse action is intended
by the employer as retaliation, it must still satisfy this
materiality standard.  Id. at 2414 ("The anti-retaliation provision
protects an individual from not all retaliation, but from
retaliation that produces an injury or harm.").  Defendants argue
that plaintiff has failed to establish a prima facie case of
retaliation because she cannot establish that they took a
materially adverse employment action against her, and because she
cannot establish a causal connection between her protected activity
and any adverse employment action.

          (b)  Application of the Law to the Facts

     Booker contends that in response to contacting an EEO
counselor she was reassigned to a "punish desk," she was given a
"does not meet expectations" PAR rating in July 2005, and she was
denied a promotion in September of 2005.[82]

               **(1)  Assignment to "Punish Desk"**

     Booker argues that she suffered an adverse employment action

_____

          [82]Plaintiff's Response, Docket Entry No. 26, at 14.

in retaliation for having contacted an EEO counselor because shortly after she contacted the EEO counselor she was re-reassigned to the "punish desk" in squad CI-1. Booker argues that assignment to the "punish desk" was not only humiliating and embarrassing but that it also stripped her of her duties:

> My reassignment to the squad CI-1 punish desk was punitive. . . While working as an SST with the C4-E squad, my duties included inputting bank robbery statistical data into the BRSA system; ensuring newly assigned taskforce members were in compliance with security protocol by coordinating security escorts for their time spent at the facility; creating task force schedules; coordinating the 90-day training schedule for new agents assigned to the C4-E squad; answering the phone daily, daily filing, serializing files, uploading files/documents, time and attendance; and victim witness reports. When I was reassigned, my duties were reduced to filing once per week, time and attendance and answering the phone on average three (3) times per week. I uploaded a document every once in a while but I no longer serialized documents.[83]

Booker admits that her transfer from the C4-E squad to the CI-1 squad did not affect her job title, compensation, pay grade, or benefits.[84]   Booker's sole argument to refute defendants' contention that her transfer was lateral is that her job duties were diminished. However, the only job duty that Booker states she performed for the C4-E squad but did not perform for the CI-1 squad was the duty of serializing documents. The other reductions in duties of which she complains are merely reductions in the

---

[83]Declaration of Laura Booker, ¶ 30 (included in Plaintiff's Response, Docket Entry No. 26, at Exhibit 2).

[84]Oral Deposition of Laura Booker, at 80-81 (included in Defendants' Motion, Docket Entry No. 22, at Exhibit 1).

frequency with which she performed certain duties such as filing and answering phones. Booker fails to explain how and/or why the reductions in duties of which she complains effected a materially adverse change that would dissuade a reasonable worker from making or supporting a charge of discrimination. Booker's subjective preference for a different position cannot make her transfer to the CI-1 squad a materially adverse action. See Aryain, 534 F.3d at 485 (citing White, 126 S.Ct. at 2405, as noting that the standard is objective). Absent evidence that Booker's transfer to the CI-1 squad effected a materially adverse change in her job duties, Booker has failed to present any evidence from which a rational juror could conclude that the reductions in duties of which she complains effected anything more than trivial harms.

### (2) "Does Not Meet Expectations" Ratings

Booker argues that she suffered a material adverse employment action in retaliation for having filed a formal complaint of discrimination with the DOJ because the day after she received an annual Performance Appraisal Review that contained "does not meet expectations" in two of seven critical categories. Since, however, Booker admits that two "does not meet expectations" ratings that she received on the PAR dated July 27, 2005, were amended to "meets expectations" less than a month later on August 24, 2005,[85] and that the amendments eliminated any negative impact the original ratings

---

[85]Id. at 63-65.

could potentially have had on her future prospects for promotion or other favorable employment actions,[86] Booker is unable to establish that the "does not meet expectations" ratings that she received in July of 2005 effected a materially adverse change that would dissuade a reasonable worker from making or supporting a charge of discrimination.

### (3)   Denial of Promotion in September 2005

Booker has submitted a two-page exhibit showing that there were two vacancies for an OSS position in Houston, that the period for applying for these vacancies was September 22 through October 5, 2005, and that on October 6, 2005, Graciela Medina was selected for the position of OSS.[87]   Denial of a promotion is a material, adverse employment action sufficient to support a claim of retaliation.   See Taylor v. United Parcel Service, Inc., 554 F.3d 510, 522 (5th Cir. 2008).

The only evidence of a connection between the Defendants' failure to promote Booker to the position of OSS in October of 2005 and Booker's protected conduct is the timing; this second failure to promote Booker followed slightly less than six months after she initiated contact with an EEO counselor on May 20, 2005, and just over two months after she filed a formal complaint of discrimination on July 27, 2005.   The Fifth Circuit has held that "the combination of suspicious timing with other significant

---

[86]Id. at 81.

[87]Declaration of Laura Booker (included in Plaintiff's Response, Docket Entry No. 26, at Exhibit 11).

evidence of pretext, can be sufficient to survive summary judgment." Shackelford v. Deloitte & Touche, LLP, 190 F.3d 398, 409 (5th Cir. 1999). See Strong v. University Healthcare System, L.L.C., 482 F.3d 802, 808 (5th Cir. 2007) ("temporal proximity alone is insufficient" to prove retaliation, holding three-and-a-half months between protected activity and termination insufficient to establish retaliation).

However, a rational juror could not conclude that Mattix's proffered reasons for failing to promote Booker were pretextual because she has failed to produce any evidence to create a jury issue as to the Defendants' discriminatory animus or the falsity of Mattix's legitimate, nondiscriminatory explanation for his decision not to promote her in October of 2005. Attached to Defendants' motion to dismiss is the sworn statement of AO Mattix in which he explains his decisions not to promote Booker to the position of OSS in either March or October of 2005 as follows:

> As the AO of the Houston Division, I am aware of the background regarding some of the issues raised by Booker. I recall conducting a competency verification interview (CVI) with Laura Booker, Karla Proctor and Gracie[la] Medina, three HO division support employees, in early 2005, who had applied for an Office Support Supervisor (OSS) vacancy. . .
>
> . . .
>
> . . . I conducted the CVI of each of the women in a professional manner that allowed me to fairly assess the skill sets and strengths of each candidate. As the selecting official, I chose Karla Proctor for the position after judging her as possessing the best skill set of the three women candidates.

-46-

. . .

Booker was reassigned to CI-1 because of her non-performance and problematic behavior on Squad CE-4, while supervised by OSS McAdams and Supervisory Special Agent Kenneth Ivy.  I learned that Booker refused to do work assignments tasked to her by [her] supervisors, including contacting the SAs for time and attendance information, maintaining Ivy's appointment schedule, and maintaining the squad files in an acceptable manner.  Booker was also moved from CE-4 because of her aggressive attitude toward Ivy's management and the agents on the squad.  I am aware from conversations with management that Booker was aggressive with the CE-4 staff, including questioning the authority of supervisors and work-related assignments and directions given to her.

. . .

I understand [that] Booker continues to display aggressive behavior with her current OSS Terrie Galloway. I have coached Galloway when she has told me that Booker has become loud and disrespectful of her and questioned her authority.  I have told Galloway to set boundaries for Booker and to take the high road and not get loud or aggressive back to Booker.  . . .

I interviewed Booker a second time in late 2005 for another OSS vacancy.  She was advised in advance of this CVI.  Although she was dressed more professionally than her previous OSS CVI, the results of the interview were basically the same.  The other candidates were deemed better qualified, and had better people skills and work ethics.

After this interview, I talked with Booker and provided her with feedback.  I told her that she possesses a great deal of potential and could possibly make a good supervisor.  I also told her that she needed to be able to follow directions as a subordinate if she hoped one day to give directions as a supervisor.  I also told her that she needed to improve her behavior and control her anger.[88]

---

[88]Sworn Statement of Rodney K, Mattix, at 3-9 (included in Defendants' Motion, Docket Entry No. 22, at Exhibit 2).

Mattix's sworn statement contains a legitimate, non-discriminatory reason for the failure to promote Booker to the OSS position in October of 2005.  In light of what Mattix told Booker when he talked to her following her second interview for the position of OSS in less than a year, it is clear that Mattix's decision not to promote Booker was based on her history of refusing to follow directions and behaving aggressively toward her supervisors and others in her squad.  Since Booker's own description of her conduct toward her supervisors and other members of Squad C4-E shows that she did, in fact, refuse to perform work assignments tasked by her supervisors and that she behaved aggressively toward her supervisors and others, Booker has failed to present evidence from which a rational juror could conclude that the reasons for which Mattix denied her a promotion to the OSS position in October of 2005 are pretextual.  Accordingly, the court concludes that Booker has failed to raise a genuine issue of material fact for trial on whether the Defendants' failure to promote her to the OSS position in October of 2005 was in retaliation for having engaged in protected conduct.

(c)  Conclusions on Retaliation Claims

Defendants' motion for summary judgment on Booker's retaliation claims will be granted because viewing the evidence submitted in a light most favorable to Booker, the court concludes that the evidence is not sufficient for a rational juror to

-48-

conclude that either her transfer to Squad CI-1 or the two "does not meet expectations" ratings Booker received on her PAR in July of 2005, effected a materially adverse employment action that would dissuade a reasonable worker from making or supporting a charge of discrimination, and that although the failure to promote her to the OSS position in October of 2005 did effect a material adverse employment action, Booker has failed to present evidence of a causal connection between her engagement in protected activity and Mattix's decision not to promote her to the position of OSS in October of 2005.

## V.  Order

For the reasons explained above, the Federal Defendants' Motion to Dismiss Unexhausted Claims & Motion for Summary Judgment as to All Remaining Claims (Docket Entry No. 22) is **GRANTED**.

**SIGNED** at Houston, Texas, on this 17th day of November, 2009.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE